## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>     v.<br><br>STAVIS SEAFOODS, INC.<br><br>   Defendant. | )<br>)<br>)<br>)<br>)  Civil No. <u>18-cv-12199</u><br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

The United States of America, by the authority of the Attorney General, through the undersigned attorneys, acting at the request of the Administrator of the Environmental Protection Agency ("EPA"), alleges as follows:

## NATURE OF ACTION

1. This is a civil action for penalties against Defendant Stavis Seafoods, Inc. ("Defendant" or "Stavis") for violations of Section 112(r)(1) of the Clean Air Act ("CAA"), 42 U.S.C. § 7412(r)(1), Section 312 of the Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA"), 42 U.S.C. § 11022, and Section 103(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9603(a).

## PARTIES

2. Plaintiff is the United States of America.  Authority to bring this action is vested in the Attorney General by Section 305 of the CAA, 42 U.S.C. § 7605, Section 325(c) of EPCRA, 42 U.S.C. § 11045(c), Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), and 28 U.S.C. §§ 516 and 519.

3.      Stavis is a corporation, organized under the laws of the Commonwealth of Massachusetts, with corporate headquarters at 212 Northern Avenue, Suite 305, Boston, Massachusetts.

4.      Stavis operated a seafood processing facility at 7 Channel Street, Boston, Massachusetts ("Facility").

5.      Stavis is a "person" within the meaning of:

      a.      Section 302(e) of the CAA, 42 U.S.C. § 7602(e);

      b.      Section 329(7) of EPCRA, 42 U.S.C. § 11049(7), and 40 C.F.R. § 370.66; and

      c.      Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), and 40 C.F.R. § 302.3.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action and over Defendant under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 325(c)(4) of EPCRA, 42 U.S.C. § 11045(c)(4), Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), and 28 U.S.C. §§ 1331, 1345, and 1355.

7.      Venue is proper in this District under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 325(c) of EPCRA, 42 U.S.C. § 11045(c), Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), and 28 U.S.C. §§ 1391(b)-(c) and 1395(a), because the Defendant resides within this judicial District, the events or omissions giving rise to the claims in this Complaint occurred within this District, the property that is the subject of this action is situated in this District, and the civil penalties sought in this action have accrued in this District.

8.     Notice of commencement of this action has been given to the Commonwealth of Massachusetts as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## STATUTORY AND REGULATORY FRAMEWORK

### Clean Air Act

9.     The CAA, 42 U.S.C. §§ 7401 *et seq.*, establishes a comprehensive scheme for air pollution prevention and control, as described in Section 101 of the CAA, 42 U.S.C. § 7401.

10.     Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).

11.     The purpose of Section 112(r) of the CAA and its implementing regulations is "to prevent the accidental release and to minimize the consequences of any such release" of an "extremely hazardous substance."  42 U.S.C. § 7412(r)(1).

12.     Section 112(r)(1) of the CAA, known as the "General Duty Clause," provides, in pertinent part:

> The owners and operators of stationary sources producing, processing, handling or storing [any extremely hazardous] substances have a general duty, in the same manner and to the same extent as section 654 of Title 29 [the Occupational Safety and Health Act section entitled "Duties of employers and employees"], to identify hazards which may result from such releases [of extremely hazardous substances] using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

42 U.S.C. § 7412(r)(1) (bracketed notations added).

13.     Under Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3), the term "extremely hazardous substances" includes, but is not limited to, substances listed in 40 C.F.R. § 68.130 and in 40 C.F.R. Part 355, Appendices A and B, published under Section 302 of EPCRA, 42 U.S.C. § 11002.

14.     The term "accidental release" is defined in Section 112(r)(2)(A) of the CAA, 42 U.S.C. § 7412(r)(2)(A), to mean an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

15.     The term "stationary source" is defined in Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C), to mean, in pertinent part, any buildings, structures, equipment, installations or substance-emitting stationary activities, located on one or more contiguous properties under the control of the same person, from which an accidental release may occur.

16.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the United States to commence a civil judicial enforcement action for violations of any requirement or prohibition of Subchapter I of the CAA, 42 U.S.C. §§ 7401-7515, including Section 112(r), 42 U.S.C. § 7412(r), and seek civil penalties of up to $25,000 per day for each violation, injunctive relief, or both.

17.     Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 ("DCIA"), as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, by the Federal Civil Penalties Inflation Adjustment Act Improvement Act, Pub. L. 114-74, Title VII, Section 701 (Nov. 2, 2015) (*see* 28 U.S.C. § 2461 note), EPA's Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, promulgated under the DCIA, and 83 Fed. Reg. 1190 (January 10, 2018) (amending 40 C.F.R. Part 19) (collectively, the "Inflation Adjustment Provisions"), the maximum amount of civil penalties for which a person shall be liable under CAA Section 113(b), 42 U.S.C. § 7413(b), was increased to $37,500 per day for each violation occurring after January 12, 2009, through November 2, 2015; and to $97,229 per day for each violation occurring after November 2, 2015.

4

**Emergency Planning and Community Right-to-Know Act**

Section 312 of EPCRA

18.     Under Section 312(a) of EPCRA, 42 U.S.C. § 11022(a), and 40 C.F.R. Part 370,

Subparts A and B, and Subpart C §§ 370.40 to 370.45, the owner or operator of a facility that is

required to prepare or have available a Material Safety Data Sheet ("MSDS") or Safety Data

Sheet ("SDS")[1] for a hazardous chemical under the Occupational Safety and Health Act, 29

U.S.C. §§ 651 *et seq.* ("OSH Act"), and implementing regulations, including 29 C.F.R.

§ 1910.1200, shall prepare an emergency hazardous chemical inventory form ("Inventory

Form") and submit it to the appropriate State Emergency Response Commission ("SERC"), the

appropriate local emergency planning committee ("LEPC"), and the fire department with

jurisdiction over the facility, annually, on or before March 1 of each year.  The Inventory Form

must contain information for the preceding calendar year.

19.     Section 312(b) of EPCRA, 42 U.S.C. § 11022(b), authorizes EPA to establish

minimum threshold levels of hazardous chemicals for the purposes of Section 312(a) of EPCRA,

42 U.S.C. § 11022(a).

20.     In Appendices A and B of 40 C.F.R. Part 355, EPA established a list of extremely

hazardous substances and their threshold planning quantities for purposes of EPCRA.  In

accordance with Section 312(b) of EPCRA, 40 C.F.R. §§ 370.10 and 355 establish minimum

threshold levels for hazardous chemicals.  Most hazardous chemicals, including lead, have a

---

[1] Since May 25, 2012, OSHA's hazard communication regulations have replaced the term MSDS with "Safety Data Sheet."  *See* 29 C.F.R. § 1910.1200.  EPA's EPCRA regulations reference both terms.

5

threshold level of 10,000 pounds. Minimum threshold limits of 500 pounds are established for specific extremely hazardous substances, including ammonia and sulfuric acid.

21.     An owner or operator of a facility must comply with the reporting requirements of EPCRA Section 312(a) if the Occupational Safety and Health Administration's ("OSHA") Hazard Communication Standard requires the facility to prepare or have available an MSDS or SDS for a hazardous chemical and if such chemical is present above threshold levels specified in 40 C.F.R. § 370.10. For extremely hazardous substances, the EPCRA Section 312(a) reporting requirement applies if the substance is present at the facility in an amount equal to or greater than the lower of (a) 500 pounds or (b) the chemical's Threshold Planning Quantity, under 40 C.F.R. Part 355, Appendix A and B.  40 C.F.R. §§ 370.10(a) and 370.12.

22.     Under Section 312(a)(2) of EPCRA, 42 U.S.C. § 11022(a)(2), and 40 C.F.R. Part 370, the Inventory Form shall contain "Tier I" information for the preceding calendar year, as such information is described in EPCRA Section 312(d)(1), unless the owner or operator provides more extensive "Tier II" information, under EPCRA Section 312(d)(2), for the same time period by the same deadline.

23.     The Commonwealth of Massachusetts requires facilities subject to EPCRA Section 312 to submit "Tier II" forms containing chemical-specific information, rather than "Tier I" forms containing aggregate information by hazard category.  *See* https://www.mass.gov/service-details/state-emergency-response-commission-serc (last visited February 23, 2018).

24.     Under Section 325(c)(1) of EPCRA, 42 U.S.C. § 11045(c)(1), the Administrator of EPA may bring an action for a civil penalty of up to $25,000 for each violation of any requirement of EPCRA Section 312, 42 U.S.C. § 11022.

6

25.     Under the Inflation Adjustment Provisions, the maximum amount of civil

penalties for which a person shall be liable under EPCRA Section 325(c)(1), 42 U.S.C.

§ 11045(c)(1), was increased to $37,500 for each violation occurring after January 12, 2009,

through November 2, 2015; and to $55,907 for each such violation occurring after November 2,

2015.

**Comprehensive Environmental Response, Compensation, and Liability Act**

Section 109 of CERCLA

26.     Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires that any person in

charge of an onshore facility report the non-permitted release of a hazardous substance from the

facility to the National Response Center ("NRC") as soon as that person has knowledge of such a

release in an amount equal to or greater than the reportable quantity under Section 102 of

CERCLA, 42 U.S.C. § 9602, and 40 C.F.R. § 302.4.

27.     Section 102(a) of CERCLA, 42 U.S.C. § 9602(a), requires the Administrator of

EPA to, among other things, promulgate regulations establishing the reportable quantities of any

hazardous substance, the release of which shall be reported under Section 103 of CERCLA, 42

U.S.C. § 9603.

28.     Under CERCLA Sections 102 and 103, 42 U.S.C. §§ 9602 and 9603, EPA

promulgated federal regulations, known as the "CERCLA Notification Rules," published at

40 C.F.R. Part 302.  These CERCLA Notification Rules designate hazardous substances, identify

reportable quantities for these substances, and set forth notification requirements for these

substances.

29.     The regulations at 40 C.F.R. § 302.6 require, among other things, that any person

in charge of an onshore facility shall, as soon as he or she has knowledge of any non-permitted

release of a hazardous substance from such facility in quantities equal to or greater than the reportable quantity, immediately notify the National Response Center of such release.

30.     Under Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), the United States may bring an action for a civil penalty of up to $25,000 for each day during which a violation of the notice requirements of CERCLA Section 103(a), 42 U.S.C. § 9603(a), continues and up to $75,000 for each day during which a second or subsequent violation of such notice requirements continues.

31.     Under the Inflation Adjustment Provisions, for each day during which an initial violation (or failure or refusal) of the notice requirements of CERCLA Section 103(a), 42 U.S.C. § 9603(a), continues, the civil penalty under CERCLA Section 109(c), 42 U.S.C. § 9609(c), was increased to $55,907 per day for each such violation occurring after November 2, 2015.

## GENERAL ALLEGATIONS

32.     At all times relevant to the allegations in this Complaint, Stavis was an "operator" of the Facility, within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9), Sections 312 and 325 of EPCRA, 42 U.S.C. §§ 11022 and 11045, and Section 101(20)(A) of CERCLA, 42 U.S.C. § 9601(20)(A).

33.     The Facility is a "stationary source" as that term is defined at Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C).

34.     The Facility is a "facility" as that term is defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and EPA's EPCRA regulations at 40 C.F.R. § 370.66.

35.     At all times relevant to the allegations in this Complaint, operations at the Facility included the processing, handling, use, and storing of anhydrous ammonia in an ammonia

refrigeration system ("System"), which cycled at least 5,400 pounds of anhydrous ammonia through various physical states to provide refrigeration for freezing of incoming fresh seafood and for storage of fresh and frozen products.

36.    Anhydrous ammonia is a concentrated form of ammonia.  It is a clear, colorless gas at atmospheric conditions of temperature and pressure with a strong odor.  It is often stored and shipped under pressure as a liquid.  Anhydrous ammonia is corrosive and may burn skin, eyes, and lungs.  It has a boiling point of approximately -28°F and may cause frostbite. Anhydrous ammonia is hydrophilic (or "hygroscopic"), meaning it has a high affinity for water and migrates to moist areas of the body, such as eyes, nose, mouth, throat, and lungs.  Ammonia vapor may be fatal if inhaled.  Exposure to ammonia at 300 parts per million ("ppm") is immediately dangerous to life or health.  Anhydrous ammonia burns at concentrations of approximately 15% to 28% by volume in air with a source of ignition.  It can explode if released in an enclosed space with a source of ignition present or if a vessel containing anhydrous ammonia is exposed to fire.  The fire hazard increases in the presence of oil or other combustible materials.

37.    Anhydrous ammonia is listed as an extremely hazardous substance under Section 112(r)(3) of the Clean Air Act, 42 U.S.C. § 7412(r)(3), and Appendix A to 40 C.F.R. Part 355.  Anhydrous ammonia is a concentrated form of ammonia within the meaning of 40 C.F.R. Part 355, Appendix A.  It is also a "hazardous chemical" under EPCRA Section 329(5), 42 U.S.C. § 11049(5), for which a facility is required to prepare or have available an MSDS or SDS for a hazardous chemical under OSHA and implementing regulations, including 29 C.F.R. § 1910.1200(a) and (g).

38.     Sulfuric acid and lead are each "hazardous chemicals" under EPCRA Section 329(5), 42 U.S.C. § 11049(5).

39.     Due to the risks associated with anhydrous ammonia, the ammonia refrigeration industry has developed industry standards to control the risks associated with its use.  In collaboration with the American National Standards Institute, the International Institute of Ammonia Refrigeration ("IIAR") has issued *Standard 2: Equipment, Design, and Installation of Closed-Circuit Ammonia Mechanical Refrigerating Systems*, including several updates, along with other applicable bulletins and guidance documents for ammonia refrigeration systems. These bulletins and guidance documents include without limitation:  IIAR Bulletin No. 109, *Guidelines for IIAR Minimum Safety Criteria for a Safe Ammonia Refrigeration System* (1997); IIAR Bulletin No. 110, *Guidelines for Start-Up, Inspection, and Maintenance of Ammonia Mechanical Refrigerating Systems* (rev. 2002); IIAR Bulletin No. 114, *Guidelines for Identification of Ammonia Refrigeration Piping and System Components* (1991 and 2014 editions); IIAR Bulletin 116, *Guidelines for Avoiding Component Failure in Industrial Refrigeration Systems Caused by Abnormal Pressure or Shock* (1992); and the 2005 *Ammonia Refrigeration Management Program* ("IIAR ARM Program"), intended for systems containing less than 10,000 pounds of ammonia.  Also, in collaboration with the American National Standards Institute, the American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE") has issued (and updates) *Standard 15: Safety Standard for Refrigeration Systems*, including several amendments.  These standards are consistently relied upon by refrigeration experts and have been incorporated by reference into state, building, mechanical, and fire codes.

40.     At all times relevant to this Complaint, at least 1,360 pounds of sulfuric acid were stored at the Facility in lead acid batteries annually from 2013 to 2016.

41.     Sulfuric acid is an extremely hazardous substance under EPCRA § 302 and a hazardous substance under CERCLA § 103(a).  *See* 40 C.F.R. Part 355, Appendix A and 40 C.F.R. § 302.4, Table 302.4.  Sulfuric acid is corrosive.  Exposure to it may result in severe burns and damage to skin or mucous membranes.  Sulfuric acid is highly reactive and can ignite combustible materials on contact.  When heated, it emits highly toxic fumes.  It can also react violently with water.  Lead acid batteries have the potential to emit hydrogen gas which, upon ignition, may result in a fire or explosion.

42.     At all times relevant to this Complaint, at least 15,641 pounds of lead were stored at the Facility in lead acid batteries annually from 2013 to 2016.

43.     Lead is a hazardous chemical as defined under 29 C.F.R. § 1910.1200, and exposure to it presents health hazards, including but not limited to adverse cardiovascular effects, decreased kidney failure, and reproductive problems in men and women.  Lead acid batteries have the potential to emit hydrogen gas which, upon ignition, may result in a fire or explosion.

44.     The Facility is located near the Marine Industrial Park area in Boston's Seaport District, which is a mixed-use section of the waterfront in Boston, Massachusetts, within close proximity to commercial buildings, residences, hotels, bars, restaurants, and an outdoor entertainment facility.  A release of anhydrous ammonia from the Facility could have serious negative health consequences for people coming into contact with the chemical.

45.     On March 23, 2016, at least 2,169 pounds of anhydrous ammonia were released at the Facility from a broken pipe and valve from the vessel/pilot high pressure receiver in the Facility's ammonia machinery room ("Release").

11

46.     On March 23, 2016, at about 5:55 p.m., an anonymous person called 9-1-1 and reported smelling a strange odor from the vicinity of the Facility.

47.     As a result of the Release, an ammonia cloud formed, which resulted in the death of the Facilities Manager, who was responsible for the Facility's ammonia refrigeration system. The local fire department and police responded to the Release.  The Release continued for several hours, during which time the emergency responders could not turn off the leaking vessel/pilot high pressure receiver due to high concentrations of ammonia and the lack of an easily identifiable and accessible shut-off valve (also referred to as a King Valve) for the vessel. The first emergency response entry team had to turn back before reaching the victim and the source of the leak due to the high concentration of ammonia, which started to penetrate their gear, and it took four emergency response entry teams to ultimately stop the Release.

48.     As a result of the Release, the Boston Fire Department shut down the immediate area to pedestrians, redirected traffic and public transportation, and issued a shelter-in-place order to hotels and businesses in the vicinity.

49.     The Release of anhydrous ammonia from the Facility on March 23, 2016 was above the reportable quantity of 100 pounds under 40 C.F.R. § 302.4.

50.     On March 24, 2016, Stavis notified the NRC of the Release, approximately 19 hours after the Release occurred.

51.     After the Release, Stavis signed and submitted a chemical inventory form for calendar year 2015, dated March 23, 2016 that failed to report the presence of sulfuric acid and lead at the Facility.  Thereafter, Stavis signed and submitted an updated calendar year 2015 chemical inventory form on June 7, 2016 that included the amount of sulfuric acid and lead at the Facility.

52.     On March 24, 2016, EPA conducted an inspection ("March 24, 2016 Inspection") at the Facility with representatives of the Boston Fire Department, Boston Police Department, OSHA, Massachusetts Department of Public Safety, Massachusetts Department of Public Health, Massachusetts Environmental Police representing the Massachusetts Attorney General's Office, Stavis's management, and Stavis's contractor, American Refrigeration Company.  The purpose of EPA's March 24, 2016 Inspection was to investigate the Release and determine whether Stavis was complying with Section 112(r) of the CAA as well as EPCRA and CERCLA's release notification procedures.  The March 24, 2016 Inspection consisted of a walk around the Facility exterior, inside the Facility's first floor maintenance storage area, and inside the second floor ammonia machinery room area.

53.     During the March 24, 2016 Inspection, EPA inspectors observed potentially dangerous conditions relating to the System.

54.     On information and belief, Stavis removed most of the remaining ammonia from the System on April 1, 2016, but some residual ammonia remained in the System.

55.     An EPA inspector and EPA contractors re-inspected the Facility on April 6, 2016 ("April 6, 2016 Inspection"). EPA found that the System required immediate work, despite the removal of most of the ammonia on April 1, 2016.

56.     The potentially dangerous conditions that EPA observed during the March 24, 2016 and April 6, 2016 Inspections (collectively referred to as the "March and April Inspections") and identified based on a review of documentation provided by Stavis are listed in the chart attached to and made a part of this Complaint as Attachment 1.  Attachment 1 also explains how each of the conditions could lead to a release or inhibit the Facility's ability to minimize any releases that do occur.

13

57.     On July 6, 2016, EPA sent Stavis a letter providing notice of potential General

Duty Clause violations, EPA's inspection reports, and a request for information.

58.     On September 19, 2016, EPA issued a Notice of Violation and Administrative

Order ("Order") to Stavis, alleging that the company operated its ammonia-based refrigeration

system in violation of each of the three components of the CAA General Duty Clause set out

below.  The Order required Stavis to hire a refrigeration expert to help perform the work required

under the Order, submit and implement a Removal Plan to safely conduct the removal of the

ammonia that remained in the System after the Release, submit and implement a Work Plan if

ammonia remained in the System after October 30, 2016, refrain from adding more ammonia to

the System until the Work Plan was completed, and submit a Removal Plan and Work Plan

Completion Report documenting the completion of the work required under the Order.

## FIRST CLAIM FOR RELIEF
### (CAA Section 112(r)(1) – Failure to Identify Hazards)

59.     All other paragraphs of this Complaint are incorporated by reference as if set forth

fully herein.

60.     Anhydrous ammonia is an "extremely hazardous substance," within the meaning

of CAA Section 112(r), 42 U.S.C. § 7412(r).

61.     At all times relevant to the allegations in this Complaint, the Facility has been a

"stationary source," within the meaning of Section 112(r)(2)(C) of the CAA, 42 U.S.C.

§ 7412(r)(2)(C).

62.     At all times relevant to the allegations in this Complaint, the Facility has been

subject to the CAA General Duty Clause, 42 U.S.C. § 7412(r)(1).

63.     At all times relevant to the allegations in this Complaint, Stavis "operated" a stationary source, within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9).

64.     At all times relevant to the allegations in this Complaint, Stavis processed, handled, or stored anhydrous ammonia, an extremely hazardous substance.

65.     Under Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), as the operator of a stationary source processing, handling, using or storing an extremely hazardous substance at all times relevant to the allegations in this Complaint, Stavis had a general duty to identify hazards, using appropriate hazard assessment techniques, which may result from the accidental release of an extremely hazardous substance at or from the Facility.

66.     Industry standards and guidelines with respect to ammonia refrigeration systems are found, *inter alia*, in the IIAR ARM Program, ANSI/IIAR Standard 2, ANSI/ASHRAE Standard 15, IIAR bulletins, and other materials (including updates and revisions) consistently relied upon in the refrigeration industry.

67.     The recommended industry practice and standard of care for identifying, analyzing, and evaluating potential hazards associated with ammonia refrigeration systems of the same size and type as the Facility's refrigeration system is, *inter alia*, to use standard, industry-developed hazard identification checklists or more formalized techniques such as a "What If" analysis.  IIAR has developed checklists for this purpose.  *See, e.g.,* IIAR ARM Program, Section 10 and Appendix 10.1; *see also* IIAR's Bulletin No. 110, *Startup, Inspection, and Maintenance of Ammonia Mechanical Refrigeration Systems,* Section 5.2.1.

68.     The duty to identify hazards that may result from hazardous releases under the General Duty Clause requires determining (a) the intrinsic hazards of the chemicals used in the processes, (b) the risks of accidental releases from the processes through possible release

scenarios, and (c) the potential effect of these releases on the public and the environment.  The document that contains this analysis is often referred to as a process hazard analysis or process hazard review ("Process Hazard Review").

69.     From at least 2003 through at least April 1, 2016, Stavis failed to perform its duty to identify hazards that may result from hazardous releases by using appropriate hazard assessment techniques, as set out in Condition 1 of Attachment 1, by failing to conduct a Process Hazard Review.

70.     Stavis violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), every day that it failed to identify hazards which may have resulted from the accidental release of an extremely hazardous substance at or from the Facility using appropriate hazard assessment techniques.

### SECOND CLAIM FOR RELIEF
(CAA Section 112(r)(1) – Failure to Design and Maintain a Safe Facility)

71.     All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

72.     Under Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), at all times relevant to the allegations in this Complaint, Stavis had a duty to, in the same manner and to the same extent as Section 654 of Title 29, design and maintain the Facility as a safe facility taking such steps as were necessary to prevent a release of an extremely hazardous substance at or from the Facility.

73.     The recommended industry practice and standard of care for designing and maintaining a safe facility employing an ammonia refrigeration system of the same size and type as Defendant's ammonia refrigeration system is to base design considerations upon applicable

16

design codes, federal and state regulations, and industry guidelines, to prevent releases or minimize their impacts, and to develop and implement standard operating procedures, preventative maintenance programs, personnel training programs, management of change practices, and incident investigation procedures.  IIAR, ASHRAE and other industry associations and organizations have developed standards and guidelines for this purpose.  These include, *inter alia*, the IIAR Bulletins; ANSI/IIAR Standard 2; the IIAR ARM Program; ANSI/ASHRAE Standard 15; and National Fire Protection Association 1, Fire Code (2006), Section 53.

74.     The instances in which Stavis failed in its general duty to design and maintain the Facility as a safe facility taking such steps as are necessary to prevent a release of an extremely hazardous substance are listed under Conditions 2-9, 11-14, 17-23, 27-28, and 30-31 of Attachment 1.

75.     Examples of the industry standards for the Defendant's failure to design and maintain the Facility as a safe facility taking such steps as are necessary to prevent a release of an extremely hazardous substance are also listed in Attachment 1.

76.     From approximately November 2012 to April 2016, Stavis violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), every day that it failed to design and maintain the Facility as a safe facility, taking such steps as were necessary to prevent a release of an extremely hazardous substance at or from the Facility.

### THIRD CLAIM FOR RELIEF
(CAA Section 112(r)(1) – Failure to Minimize the Consequences)

77.     All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

17

78.     Under the General Duty Clause, Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), at all times relevant to the allegations in this Complaint, Stavis had a duty to, in the same manner and to the same extent as Section 654 of Title 29, minimize the consequences of any accidental releases of extremely hazardous substances which do occur.

79.     Industry standards and guidelines for minimizing the consequences of an accidental release from ammonia refrigeration systems are found, among other things, in the IIAR ARM Program, ANSI/IIAR Standard 2, ANSI/ASHRAE Standard 15, IIAR bulletins, and other materials (including updates and revisions) consistently relied upon by refrigeration experts.  They include design and maintenance measures to minimize the severity and duration of releases that do occur, such as, among other things, standards for vapor detection, alarms, equipment and door labeling, emergency shut-off switches, ventilation, keeping combustible materials and electrical hazards away from ammonia, safe oil drain systems, tight construction of machinery rooms, designing safe pressure relief valves and associated piping, reducing obstructions for responders, and having emergency eye wash stations and showers.  Some of these measures are also cited in the Second Claim for Relief as they can both help prevent releases from occurring and minimize the consequences of releases that do occur.

80.     In addition, industry standards of care call for emergency response planning at facilities that have extremely hazardous substances.  Emergency response planning provides, among other things, a Local Emergency Planning Committee with information needed to complete a Comprehensive Emergency Response Plan under Section 303 of EPCRA, 42 U.S.C. § 11003.  The recommended industry practice and standard of care for emergency planning at ammonia refrigeration systems of the Facility's size is to, *inter alia*, design and implement an emergency response plan that specifically addresses release scenarios developed from hazard

18

analyses and facility-based knowledge, identifies emergency response equipment and its whereabouts, identifies communication with and involvement of emergency planning and response officials (*e.g.*, the Local Emergency Response Planning Committee), incorporates accident training for employees, and involves conducting periodic exercises to ensure that the plan is adequate to address emergency scenarios.  *See* 42 U.S.C. § 11003.  IIAR, ANSI, ASHRAE, and other organizations have developed standards and guidelines for this purpose, including, among other things, ANSI/IIAR Standard 2, the IIAR ARM Program (2005), and ANSI/ASHRAE Standard 15.  For example, Section 7 of IIAR's ARM Program for smaller ammonia refrigeration systems provides that refrigeration facilities should develop an up-to-date, facility-specific emergency response plan that accurately describes the facility and the potentially affected population.  Such a plan should include, among other items, types of evacuation, evacuation procedures and routes, procedures for employees who remain to maintain critical operations, procedures for accounting for evacuated employees, an employee's rescue and medical duties, and the means for reporting emergencies.  An adequate emergency response or action program should also identify procedures for responding to an ammonia release, including shutting the system down, starting emergency ventilation, and coordinating with relevant off-site emergency responders.  IIAR's ARM Program, Section 7.

81.     The instances in which Stavis failed in its general duty to minimize the consequences of a release should one occur are listed under Conditions 6-13, 15-18, 20, 23-27, and 29 of Attachment 1.

82.     Examples of the industry standards for the Defendant's failure to minimize the consequences of a release should one occur are also listed in Attachment 1.

83.     From approximately December 2012 to April 2016, Stavis violated Section

112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), every day that it failed to minimize the

consequences of an accidental release of an extremely hazardous substance at or from the

Facility.

### FOURTH CLAIM FOR RELIEF
(EPCRA Section 312)

84.     All other paragraphs of this Complaint are incorporated by reference as if set forth

fully herein.

85.     Under Section 312 of EPCRA, 42 U.S.C. § 11022, and 40 C.F.R. Part 270,

commencing on or before March 1 following the date upon which it was required to prepare or

have available an MSDS or SDS for the anhydrous ammonia, lead, and sulfuric acid at or in

connection with the Facility, and on or before the March 1 of each year thereafter, Stavis was

required to submit an "emergency and hazardous chemical inventory form," containing the data

regarding those chemicals at the Facility for the preceding calendar year ("Inventory Form"), to

the appropriate LEPC, the SERC, and the fire department with jurisdiction over the facility.

86.     Because anhydrous ammonia and sulfuric acid are extremely hazardous

substances, an owner or operator is subject to the chemical inventory reporting requirements of

Section 312 of EPCRA if such is present at the facility in an amount equal to or greater than 500

pounds or the threshold planning quantity listed in Appendix A of 40 C.F.R. Part 355, whichever

is lower.  The EPCRA Section 312 reporting threshold for both ammonia and sulfuric acid is 500

pounds under 40 C.F.R. § 370.10(a)(1).

87.     The EPCRA Section 312 reporting threshold for lead is 10,000 pounds.  40 C.F.R.

§ 370.10(a)(2).

88.     From at least 2013 through 2015, at least 5,400 pounds of ammonia, at least 1,360 pounds of sulfuric acid, and at least 15,641 pounds of lead were present at the Facility. Accordingly, from at least 2013 through 2015, ammonia, sulfuric acid, and lead were present at the Facility in quantities that exceeded the threshold planning quantity for purposes of EPCRA Section 312 reporting.

89.     Stavis was required to submit Inventory Forms to the appropriate LEPC, the SERC, and the fire department with jurisdiction over the Facility, on or before the following dates:

    a.     March 1, 2016 for reporting year ("RY") 2015;

    b.     March 1, 2015 for RY 2014; and

    c.     March 1, 2014 for RY 2013.

90.     Stavis failed to submit, or to timely submit, Inventory Forms to the appropriate LEPC, the SERC, and the fire department with jurisdiction over the Facility, as follows:

    a.     RY 2013 Inventory Form failed to report the presence of sulfuric acid and lead at the Facility;

    b.     RY 2014 Inventory Form failed to report the presence of sulfuric acid and lead at the Facility;

    c.     RY 2015 Inventory Form was submitted more than three weeks late, on or about March 23, 2016; and

    d.     RY 2015 Inventory Form submitted on March 23, 2016 failed to report the presence of sulfuric acid or lead at the Facility until it was updated and re-submitted on or about June 7, 2016.

21

91.     Under EPCRA Section 325(c)(3), 42 U.S.C. § 11045(c)(3), each day that Stavis
failed to timely submit an Inventory Form for anhydrous ammonia, sulfuric acid, and lead to the
appropriate LEPC, SERC, and fire department with jurisdiction over the Facility, constitutes a
separate violation of Section 312 of EPCRA, 42 U.S.C. § 11022.

**FIFTH CLAIM FOR RELIEF**
(CERCLA Section 103 – Failure to Immediately Notify the National Response Center)

92.     All other paragraphs of this Complaint are incorporated by reference as if set forth
fully herein.

93.     The Facility is an "onshore facility," within the meaning of Sections 101(9),
101(18), and 103(a) of CERCLA, 42 U.S.C. §§ 9601(9), 9601(18), and 9603(a), and 40 C.F.R. §
302.3.

94.     Stavis was "in charge" of the Facility, within the meaning of Section 103(a) of
CERCLA, 42 U.S.C. § 9603(a).

95.     Anhydrous ammonia is a "hazardous substance," within the meaning of
Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and 40 C.F.R. § 302.3.

96.     On March 23, 2016, there was a "release" of anhydrous ammonia from the
Facility, within the meaning of Sections 101(22) and 103(a) of CERCLA, 42 U.S.C. §§ 9601(22)
and 9603(a), and 40 C.F.R. § 302.3, in an amount equal to or exceeding the "reportable quantity"
of 100 pounds under Sections 102 and 103(a) of CERCLA, 42 U.S.C. §§ 9602 and 9603(a), and
40 C.F.R. § 302.3.

97.     On March 23, 2016, at or shortly after the time of the Release, Stavis had actual
or constructive "knowledge" of the release of anhydrous ammonia from the Facility, within the
meaning of Section 103(a) CERCLA, 42 U.S.C. § 9603(a).

98.    On March 23, 2016, Stavis failed to "immediately notify" the National Response Center as soon as it had knowledge of the release of a reportable quantity of anhydrous ammonia from the Facility, in violation of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

99.    Stavis violated Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), when it failed to immediately notify the National Response Center of the Release from the Facility.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff United States of America respectfully requests that this Court enter judgment for the United States and against Defendant Stavis, by providing the following relief:

1.    Order Stavis to pay a civil penalty for each day of each of its violations of the CAA, EPCRA, and CERCLA;

2.    Award the United States its costs of this action; and

3.    Grant the United States such other and further relief as the Court deems just and proper.

Respectfully Submitted,

ELLEN MAHAN
Deputy Chief
Environmental Enforcement Section
U.S. Department of Justice

Dated:   10/23/2018                    *Richard S. Greene IV*
                                       RICHARD S. GREENE IV
                                       Trial Attorney
                                       U.S. Department of Justice
                                       Environment and Natural Resources Division
                                       Environmental Enforcement Section
                                       P.O. Box 7611
                                       Washington, D.C.  20044-7611
                                       Office: (202) 307-3967
                                       Fax: (202) 514-0097
                                       Email: Richard.greene@usdoj.gov
                                       Bar No.: 024450 (TN)

                                       ANDREW E. LELLING
                                       United States Attorney

                                       JESSICA P. DRISCOLL
                                       Assistant United States Attorney
                                       One Courthouse Way, Suite 9200
                                       Boston, MA 02210
                                       617-748-3398

OF COUNSEL:

LAURA J. BERRY
Enforcement Counsel
U.S. Environmental Protection Agency
Region 1 – New England
5 Post Office Square, Suite 100
Boston, MA 02109